# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

**DONALD STEPHEN BOUTTE**,

                              Petitioner,

v.

**MARTIN BITER, et al.**,

                              Respondents.

No. 2:07-cv-01508-AK

**ORDER**

**KOZINSKI**, Circuit Judge:

A jury convicted Donald Stephen Boutte of assault and spousal rape in California state court.  He now seeks a writ of habeas corpus under 28 U.S.C. § 2254, claiming his trial counsel was ineffective.

## Background

One evening, Boutte and his wife, J.B., went to the park with a friend.  As the evening wore on, Boutte and his wife got into an argument.  She tried to walk away, but Boutte ran and caught up with her.  Boutte then threw her to the ground, causing her to hit her head and injure her leg.  After the altercation, Boutte walked J.B. back to his car and they went to a motel.

page 2

Later that night, as they were lying in bed, Boutte began kissing and fondling J.B.  She told him she didn't want to have sex.  Boutte got upset, saying that he'd never met a woman as frustrating as her, and kicked the bathroom door.  Once he calmed down, he came back to bed and started fondling her again, and they had sex.  Rep.'s Tr. 123, 150–55, 158, 161–62, 167–68, 173.

At trial, J.B. testified that she didn't consent to sex with her husband, id. at 155, and Boutte didn't testify.  The jury convicted Boutte of spousal rape; it also acquitted him of spousal abuse but convicted him of the lesser included offense of assault.  Id. at 290–91.

The Court of Appeal affirmed Boutte's convictions, People v. Boutte, No. C043775, 2005 WL 737741, at *1 (Cal. Ct. App. Mar. 30, 2005), and the California Supreme Court denied review, People v. Boutte, No. S133469 (Cal. June 22, 2005).  Boutte then filed a habeas petition in the Superior Court, which was denied.  Boutte v. Tilton, No. HC-CR-06-0000011 (Cal. Super. Ct. Oct. 17, 2006).  His subsequent petitions in the Court of Appeal and the California Supreme Court were summarily denied.  In re Boutte, No. C054295 (Cal. Ct. App. Dec. 28, 2006); In re Boutte, No. S149975 (Cal. July 11, 2007).  Finally, Boutte filed a federal habeas petition in this court, claiming ineffective assistance of trial counsel (IAC).

### Analysis

#### A.  Procedural Hurdles

**1.**  Because Boutte filed his habeas petition after the effective date of the

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the court must

first determine the degree to which AEDPA constrains review of Boutte's IAC

claim.  <u>See</u> 28 U.S.C. § 2254.  To do that, "we begin by asking which is the last

explained state-court judgment" on Boutte's claim.  <u>Ylst</u> v. <u>Nunnemaker</u>, 501 U.S.

797, 805 (1991) (emphasis omitted); <u>see</u> <u>Avila</u> v. <u>Galaza</u>, 297 F.3d 911, 918 (9th

Cir. 2002).  Here, that's the Superior Court's decision.

AEDPA commands federal courts to defer to the state courts' determinations

of federal issues on collateral review.  <u>See</u> § 2254(d)(1).  If the state court

summarily denies the petition, a federal court must presume that it denied it on the

merits and may grant the petition only if the state court's denial "resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law" or "resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the

State court proceeding." <u>Harrington</u> v. <u>Richter</u>, 131 S. Ct. 770, 783–85 (2011)

(quoting § 2254(d)(1), (2)).

The Superior Court gave the following explanation in denying Boutte's IAC claim:

> As to the grounds for relief, generally speaking, challenging the evidence and presentation of evidence, the evidence has already been reviewed and found sufficient in the decision [on direct appeal] of the Court of Appeal.  Particulars that could have been, but were not, raised in the Court of Appeal are waived.  Relief on these grounds is denied.

Boutte, No. HC-CR-06-0000011, at 1.

While this explanation is far from pellucid, it's best understood as holding that Boutte waived his IAC claim by failing to raise it on direct review.  This must be what the Superior Court meant when it referred to "presentation of evidence" and to "[p]articulars that could have been, but were not, raised in the Court of Appeal."

"Ordinarily, violation of firmly established and regularly followed state rules . . . will be adequate to foreclose review of a federal claim."  Lee v. Kemna, 534 U.S. 362, 376 (2002) (internal quotation marks omitted).  Nonetheless, there are "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question."  Id.  This is one of those exceptional cases.

While the Superior Court was correct in observing that Boutte didn't raise his IAC claim on direct appeal, it clearly erred in concluding that Boutte thereby

waived that claim.  The California Supreme Court has repeatedly explained that a

defendant need not, and generally <u>should</u> not, raise an IAC claim on direct appeal:

"Because the appellate record ordinarily does not show the reasons for defense

counsel's actions or omissions, a claim of ineffective assistance of counsel should

generally be made in a petition for writ of habeas corpus, rather than on appeal."

<u>People</u> v. <u>Diaz</u>, 834 P.2d 1171, 1203 (Cal. 1992); <u>see also</u> <u>People</u> v. <u>Seaton</u>, 28

P.3d 175, 235 (Cal. 2001) (same); <u>People</u> v. <u>Cunningham</u>, 25 P.3d 519, 588 (Cal.

2001) (same); <u>People</u> v. <u>Lucero</u>, 3 P.3d 248, 269 (Cal. 2000) (same).  It's also clear

that "the rules generally prohibiting raising an issue on habeas corpus that was, or

could have been, raised on appeal would not bar an ineffective assistance claim on

habeas corpus."  <u>People</u> v. <u>Tello</u>, 933 P.2d 1134, 1135 (Cal. 1997) (internal citation

omitted).

For the Superior Court to find waiver in a situation where the California

Supreme Court has repeatedly said there isn't waiver was an "exorbitant

application of a generally sound rule."  <u>Lee</u>, 534 U.S. at 376.  Therefore, "this case

falls within the small category of cases in which asserted state grounds are

inadequate to block adjudication of a federal claim."  <u>Id.</u> at 381; <u>see also</u>

<u>NAACP</u> v. <u>Alabama ex rel. Patterson</u>, 357 U.S. 449, 456 (1958).

Because the Superior Court improperly found Boutte's IAC claim waived, it

did not address it on the merits.  And, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."  <u>Ylst</u>, 501 U.S. at 803.  Because the Court of Appeal and the California Supreme Court summarily denied Boutte's petitions after the Superior Court issued its order, their orders are presumed to "rest upon the same ground" as the Superior Court's.  <u>See id.</u>  There is therefore no state court decision on the merits of Boutte's IAC claim to which this court could defer.  Section 2254(d) constrains federal habeas review "with respect to any claim that was <u>adjudicated on the merits</u> in State court proceedings," so it doesn't apply to federal review of Boutte's claim.  28 U.S.C. § 2254(d) (emphasis added); <u>see</u> <u>Lee</u>, 534 U.S. 387–88.

 **2.**  To support his IAC claim and motion for summary judgment, Boutte has presented a number of exhibits.  Section 2254(e)(2) precludes a federal habeas court from holding an evidentiary hearing or expanding the record "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings."  28 U.S.C. § 2254(e)(2); <u>Cooper-Smith</u> v. <u>Palmateer</u>, 397 F.3d 1236, 1241 (9th Cir. 2005).  But "a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to

the prisoner or the prisoner's counsel." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. 420, 432

(2000).

"Ordinarily diligence requires that a petitioner seek an evidentiary hearing in

state court in the manner prescribed by state law." <u>Horton</u> v. <u>Mayle</u>, 408 F.3d 570,

582 n.6 (9th Cir. 2005) (discussing section 2254(e)(2)).  When the petitioner

doesn't reach the stage of proceedings where an evidentiary hearing should be

requested, "he has not shown a lack of diligence at the relevant stages of the state

court proceedings." <u>Id.</u> (internal quotation marks omitted).  In California, a request

for an evidentiary hearing is needed only at the traverse stage of the proceedings.

<u>See</u> <u>People</u> v. <u>Romero</u>, 883 P.2d 388, 392 (Cal. 1994).  All of Boutte's petitions

were dismissed before he reached the traverse stage, so his failure to request a

hearing does not amount to a lack of diligence.  <u>See</u> <u>Horton</u>, 408 F.3d at 582 n.6.

Boutte tried to develop the record throughout the state habeas proceedings.

Scrupulously following the California Supreme Court's instructions, Boutte first

raised his IAC claim in his habeas petition to the Superior Court.  There, he made

clear that proving his IAC claim required consideration of materials not part of the

record on direct review.  He specifically asked for discovery so he could provide

the court with evidence to support his claim.  Pet. of Aug. 12, 2006, at G1b2,

G4b3.  Considering Boutte was incarcerated and proceeding pro se, his requests

that "an adequate record for review . . . be developed" and that his "wife's psychiatric records . . . be disclosed" are more than enough to show diligence in seeking to expand the record in state court.  Id. at G1b2, G4b3.

Because AEDPA doesn't stand in the way of an evidentiary hearing here, the court must turn to pre-AEDPA law.  Horton, 408 F.3d at 582 n.6.  To be entitled to an evidentiary hearing under that law, a petitioner must (1) make allegations that, if proved, entitle him to relief; and (2) show "the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts."  Silva v. Woodford, 279 F.3d 825, 853 (9th Cir. 2002) (internal quotation marks omitted).  Because Boutte didn't receive a hearing on his IAC claim in state court, the only question is whether his IAC claim, if proved, entitles him to relief.  See id.

Boutte alleges that his trial counsel failed to investigate grounds for impeaching his wife, the prosecution's only witness as to whether the sex was consensual.  Boutte told trial counsel about specific incidents to investigate regarding his wife's background, incidents that would have seriously undermined her credibility and reliability as a witness.  But counsel sat on his hands.  Given the centrality of her testimony, had Boutte's attorney effectively impeached her at trial, there's a reasonable probability that the jury's verdict would have been different. If it turns out that Boutte's allegations are true (and they are) he would most

certainly be entitled to relief.  See Reynoso v. Giurbino, 462 F.3d 1099, 1113,

1118 (9th Cir. 2006); pages 9–20 infra.  Thus, Boutte is entitled to an evidentiary

hearing.  See Johnson v. Finn, 665 F.3d 1063, 1069 n.1 (9th Cir. 2011).

   In lieu of holding a full evidentiary hearing, the court may rely solely upon

written documents to expand the record.  28 U.S.C. § 2254, R.7; see Cooper-Smith,

397 F.3d at 1241.  Nevertheless, the court offered the parties the opportunity to

have a hearing, and both declined.  See Order of June 18, 2012.  The state offered

no evidence to supplement the record.  Boutte, for his part, attached to his amended

petition and motion for summary judgment a multitude of exhibits.  The court

therefore admits these exhibits into evidence and will make its rulings based on the

state court record as supplemented by these documents.

## B.  Ineffective Assistance Claim

   To show IAC, Boutte must demonstrate (1) "that counsel's performance

was deficient" and (2) "that the deficient performance prejudiced the defense."

Strickland v. Washington, 466 U.S. 668, 687 (1984).  To show deficient

performance, Boutte must prove that his counsel's conduct "fell below an objective

standard of reasonableness."  Id. at 687–88.  And to show prejudice, Boutte must

show "a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different."  Id. at 694.

### 1.  Deficient Performance

Trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  Strickland, 466 U.S. at 691.  While we afford trial counsel "leeway in making tactical decisions regarding trial strategy," if counsel doesn't first procure "the information necessary to make such a decision" we can't say he made a tactical decision at all.  Reynoso, 462 F.3d at 1112.  Where the credibility of a witness is crucial at trial, "[t]he duty to investigate is especially pressing."  Id. at 1113.  "[I]f counsel's failure to investigate possible methods of impeachment is part of the explanation for counsel's impeachment strategy (or a lack thereof), the failure to investigate may in itself constitute ineffective assistance of counsel."  Id.

The key issue at Boutte's trial—whether J.B. consented to having sex with her husband—hinged on her credibility.  J.B.'s testimony at trial was that she refused her husband's sexual advances; that he left the bed and kicked the bathroom door; and that he resumed his sexual advances when he returned to bed later and had his way with her even though she never retracted her refusal.  The prosecution didn't allege that Boutte used force or threats; no one saw or overheard

any part of the encounter in the hotel room; and there was no physical evidence to support or contradict J.B.'s testimony.

The prosecution's case rested on J.B.'s testimony that the sex wasn't consensual.  Rep.'s Tr. 153, 188, 195. Thus, her truthfulness, recollection and accuracy in recounting the circumstances of her sexual encounter with her husband were at the heart of the state's case against Boutte.  She also admitted that her memory of the day in question was "foggy."  Id. at 178.

Boutte urged his attorney to obtain materials that could impeach J.B.'s testimony by documenting a history of mental and emotional instability.  Before trial, Boutte wrote to his counsel, offering a "crash course" on J.B.'s mental state:

> Dramatic mood swings (extreme highs & lows—no in betweens), antagonistic behavior, manic and depressive phases (swinging from euphoria to irritability, to depression and then back again), very disruptive character (anxiety & erratic), many ups and downs.

Ex. 7.

A few days later, Boutte implored his attorney, "Can her psychiatric commitments be looked into?"  Ex. 8.  That request fell on deaf ears.  As Boutte's letter to counsel on the first day of trial illustrates, his attorney refused to investigate:

> You don[']t want a Dr. for her bruises or her bi-polarism. I'm facing the rest of my life in prison and you say her

> mental disorder makes no differe[n]ce.  You asked me
> about her condition over the phone—all along I've related
> to you of her mental illness issues thru correspondence and
> interviews, i.e., schizophrenia, hears voices, destructive
> relationships, absences from work, compulsions to kill
> herself and so on and so forth.  When I mentioned this [last]
> one yesterday, you stated:  "Oh!  Because she wants to kill
> herself, gives you the right to beat her up"?!

Ex. 11.

Despite Boutte's repeated urgings, his attorney obtained no documents

bearing on J.B.'s mental or emotional stability.  And, though he did cross-examine

J.B. on what she remembered and the extent to which she suffered from

depression, he offered no solid basis for the jury to doubt her competency or

veracity.  Rep.'s Tr. 164–201.

Had Boutte's counsel looked, he would have found a wellspring of

impeachment evidence.  Boutte has offered three documents from this untapped

source.  First is a Notification of Personnel Action from J.B.'s personnel file at

Beale Air Force Base, where she worked.  Ex. 14.  The Notification shows that J.B.

was suspended for using offensive language and unprofessional conduct.  Id.

Before trial, Boutte explained to his attorney that during one of J.B.'s "overly

anxious, uptight moments," she told a coworker, "'We ought to blow this f------

base up!'"  Ex. 8.  According to Boutte, one of J.B.'s supervising commanders

overheard that comment, and J.B. was suspended from work while she underwent psychiatric evaluations and an internal affairs investigation.  Id.

The second document, a Sheriff's Department Casualty Report, supports Boutte's contention that J.B. had a history of psychiatric problems.  Ex.s 21-A, 21-B.  It shows that J.B. overdosed on tranquilizers and painkillers, and was placed under a 72-hour psychiatric evaluation.  J.B. told the reporting officer she had overdosed on pills "because I'm tired of dealing with life.  I have problems with my husband and I'm having trouble at work concerning a workman's comp. claim."  Ex. 21-A.  The officer detained J.B. for evaluation "because she is a danger to herself."  Ex. 21-B.

The final document is a Sacramento County Sheriff's Department Crime Report.  Ex. 22.  It details that J.B.'s pregnant daughter had called the police to report that her mother had attacked her.  The report shows that officers went to the home where J.B. and her daughter lived.  J.B.'s daughter told the police that "her mother punched her all over."  Id.

There's no excuse for trial counsel's failure to investigate the prosecution's key witness, given everything Boutte told him.  Finding the documents Boutte has identified couldn't have been very hard; habeas counsel was able to find the documents nine years after trial.  And counsel should have been well aware that

J.B.'s testimony would make or break the prosecution's case.  Because counsel's failure to investigate the prosecution's only witness as to whether there was consent fell "outside the wide range of professionally competent assistance," Boutte's representation at trial was clearly deficient.  <u>Strickland</u>, 466 U.S. at 690.

The Ninth Circuit's holding in <u>Reynoso</u>, 462 F.3d 1099, requires a finding of deficient performance here.  The court there held that Reynoso's trial counsel was ineffective because she failed to investigate and learn that two of the prosecution's witnesses had been offered substantial payment if their testimony helped convict Reynoso.  <u>Id.</u> at 1102, 1113.  Boutte's claim of IAC is stronger than Reynoso's.  First, unlike Reynoso, Boutte personally and repeatedly directed his attorney toward the precise types of impeachment material Boutte knew existed.  <u>Compare id.</u> at 1111 <u>with</u> Ex.s 7, 8.  "Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant."  <u>Strickland</u>, 466 U.S. at 691.  Also, unlike <u>Reynoso</u>, we owe the state court no deference under AEDPA and review Boutte's claim de novo.  <u>See Reynoso</u>, 462 F.3d at 1109.  Because the Ninth Circuit found deficient performance (and prejudice) in <u>Reynoso</u>, this court must, a fortiori, find deficient performance here.  <u>See id.</u> at 1118; <u>see also Hovey</u> v. <u>Ayers</u>, 458 F.3d 892, 909 (9th Cir. 2006) (finding deficient performance).

## 2. Prejudice

In determining whether counsel's errors prejudiced Boutte, we must decide

if there is "a reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different.  A reasonable probability is

a probability sufficient to undermine confidence in the outcome."  <u>Strickland</u>, 466

U.S. at 694.  We "must consider the totality of the evidence before the . . . jury"

and decide "whether there is a reasonable probability that, absent the errors, the

factfinder would have had a reasonable doubt respecting guilt."  <u>Id.</u> at 695.

J.B.'s testimony was shaky.  She repeatedly admitted that she couldn't

remember key details of the day in question, such as how long she was in the park,

Rep.'s Tr. 179–80; how long she was in the car between the park and the motel, <u>id.</u>

at 152–53; how long she was in the motel room before she and Boutte had sex, <u>id.</u>

at 181; what she was wearing in bed, <u>id.</u> at 153; and whether she asked Boutte to

stop, <u>id.</u> at 173–74.   Indeed, when asked, "Can you remember the events in June

and July now?" J.B. admitted:  "They are foggy."  <u>Id.</u> at 178.

J.B.'s faulty memory wasn't limited to the night of the incident.  She didn't

recall that she changed her story during her preliminary examination—saying that

she fell to the ground and then later said that Boutte threw her to the ground—<u>id.</u>

at 171, or that she gave different accounts to the deputy sheriff and the district

attorney's investigator, id. at 196–97.  She even had trouble remembering her

testimony from minutes earlier as to whether she was under the influence of

medication on the day in question.  Id. at 165.

The California Supreme Court has explained, "In determining the credibility

of a witness, the jury may consider any matter that has a tendency in reason to

prove or disprove the truthfulness" of that witness's testimony.  People v. Harris,

118 P.3d 545, 565 (Cal. 2005).  Specifically, "the mental illness or emotional

instability of a witness can be relevant on the issue of credibility, and a witness

may be cross-examined on that subject, if such illness affects the witness's ability

to perceive, recall or describe the events in question."  People v. Gurule, 51 P.3d

224, 249 (Cal. 2002).

At trial, J.B. opened the door to being cross-examined on her mental and

emotional instability by admitting, "I have a chemical disorder of major

depression."  Rep.'s Tr. 184.  Had Boutte's counsel been armed with the

documents Boutte now presents this court, the jury would have seen and heard

proof of J.B.'s instability: being suspended from work for a psychiatric evaluation,

overdosing on pills and attacking her pregnant daughter.

The warden doesn't claim that any of the documents were inadmissible

hearsay, and so has waived that argument.  Instead, the warden argues that none of

these documents tend to disprove J.B.'s truthfulness, ignoring the wide latitude defense counsel has in attacking prosecution witnesses' credibility.  See People v. Stewart, 193 Cal. Rptr. 799, 804 (Cal. Ct. App. 1983).

As to the Notification of Personnel Action, which showed J.B. was suspended from work for offensive language and unprofessional conduct, the warden notes that suspension from work doesn't relate to an individual's capacity for truthfulness.  Opp'n to Summ. J. 14.  But the reason for J.B.'s suspension suggests that she's mentally and emotionally unstable, and it's on those grounds that Boutte might have used the document to impeach J.B.  The warden also argues that the document alone fails to show J.B.'s comment about blowing up the base was the grounds for her suspension.  Id.  But the document, coupled with Boutte's explanation of the suspension, see Ex. 8, could have been used as a good faith basis for asking J.B. about the reason for the suspension and why she made those comments.  In any event, had counsel pursued this lead, he may have been able to find the witnesses who heard J.B. utter the comment about blowing up the air base. See page 12 supra.

The warden also argues that the Crime Report, which contained the allegation by J.B.'s daughter, wasn't relevant to truthfulness.  Opp'n to Summ. J. 15.  The California Supreme Court has held that "[m]isconduct involving moral

turpitude may suggest a willingness to lie, and this inference is not limited to

conduct which resulted in a felony conviction." People v. Wheeler, 841 P.2d 938,

945 (Cal. 1992).  The warden argues that the report couldn't have been admitted

because J.B.'s alleged battery of her pregnant daughter wasn't a crime of moral

turpitude.  Opp'n to Summ. J. 15.  For impeachment, however, the label of the

crime doesn't matter.  "In applying the moral turpitude test to misconduct that did

not result in a conviction, the trial judge is not required to give a particular penal

label to the offense."  3 B. E. Witkin, California Evidence ch. XI, § 314, at 394

(4th ed. 2000); see also People v. Lepolo, 63 Cal. Rptr. 2d 735, 737–38 (Cal. Ct.

App. 1997).

     The evidence's admissibility "turns solely on whether the misconduct in

question evinces moral turpitude"—in other words, whether it suggests a "general

readiness to do evil."  3 Witkin, ch. XI, § 314, at 394; People v. Castro, 696 P.2d

111, 118 (Cal. 1985) (internal quotation marks and emphasis omitted).  It seems

very likely the trial judge would have found that punching her pregnant daughter

indicated J.B. had a "general readiness to do evil."  Castro, 696 P.2d at 118

(internal quotation marks and emphasis omitted).

     Finally, the warden argues that the Crime Report pertained to a decade-old

incident, and would have been excluded under California Evidence Code § 352,

which is California's equivalent of Federal Rule of Evidence 403.  Opp'n to

Summ. J. 16.  The presumption of section 352 is that relevant evidence <u>is admitted</u>

unless doing so is "substantially outweighed by the probability that its admission

will (a) necessitate undue consumption of time or (b) create substantial danger of

undue prejudice, of confusing the issues, or of misleading the jury."  Cal. Evid.

Code § 352.  The Crime Report presents none of these dangers and any staleness of

the information would go to the weight, not the admissibility, of such evidence.

<u>See</u> <u>People</u> v. <u>Burgener</u>, 29 Cal. 4th 833, 867 (2003).

Even if the documents wouldn't have been admitted, there's still a

reasonable probability that they would have changed the outcome of the trial.

Investigation can do more than just yield admissible evidence; it can also suggest

fruitful lines of questioning that demolish a witness on cross-examination.

Obtaining the documents in question would have given Boutte's attorney

foundation for asking questions that would have forced J.B. either to commit

perjury or to answer honestly and call into question her own credibility as a

witness.  That's surely one reason the Ninth Circuit held that, "if counsel's failure

to investigate possible methods of impeachment is part of the explanation for

counsel's impeachment strategy (or a lack thereof), <u>the failure to investigate may</u>

<u>in itself</u> constitute ineffective assistance of counsel."  <u>Reynoso</u>, 462 F.3d at 1112

(emphasis added).

Boutte's trial—and, in particular, J.B.'s pivotal testimony—presented a close call for the jury.  In fact, the jury's verdict suggests it didn't completely believe J.B.'s testimony.  While the jury convicted Boutte of spousal rape, it acquitted him of spousal abuse and convicted him of the lesser included offense of assault.  Rep.'s Tr. 290–91.  At trial, the prosecution argued that Boutte had thrown J.B. down at the park, and J.B. testified that the fall injured her leg.  Rep.'s Tr. 158, 249.  The acquittal on the abuse charge suggests the jury didn't believe that J.B. suffered an injury at the hands of Boutte, because while spousal abuse includes an element of bodily injury, assault does not.  Compare Cal. Penal Code § 273.5(a) (spousal abuse) with Cal. Penal Code § 240 (assault).

Had jurors known of J.B.'s prior conduct, there's a reasonable probability they would have changed their assessment of her credibility and their verdict.  Thus, under Strickland, Boutte was prejudiced by his trial counsel's ineffective assistance.  See Strickland, 466 U.S. at 691–92; Reynoso, 462 F.3d at 1118.

*          *          *

**SUMMARY JUDGMENT GRANTED TO PETITIONER; PETITION CONDITIONALLY GRANTED.**  Boutte is ordered released unless the state of

page 21

California notifies this court within thirty days of the filing of this order that it

intends to retry Boutte, and actually commences Boutte's retrial within ninety

days.

October 4, 2012

_____

**ALEX KOZINSKI**
Chief Circuit Judge
Sitting by designation
28 U.S.C. § 291(b)
